UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 3:25-CR-00016-GFVT-MAS |
| | ) |
| TIMOTHY SCOTT ACKER, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION & ORDER**

Defendant Timothy Scott Acker ("Acker") came before the undersigned for an initial appearance on January 14, 2026. [DE 10]. The United States moved to detain Acker, and the Court conducted a detention hearing. Considering the record—including testimony, proffer, the Pretrial Services Report ("PSR"), and arguments—the Court finds that Acker must be detained in accordance with the Bail Reform Act ("BRA") and shall grant the United States' motion for detention.

**I.    ANALYSIS**

Acker is charged with knowingly possessing a matter containing visual depictions that had been transported in and affecting interstate and foreign commerce, the production of which involved the use of a minor engaging in sexually explicit conduct and the visual depictions were of such conduct, in violation of 21 U.S.C. § 2252(a)(4)(B). [DE 1]. At the initial appearance, the United States orally

moved for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(E). [DE 10]. The Court conducted a detention hearing on January 20, 2026. [DE 13].

## A. LEGAL STANDARD FOR DETENTION UNDER THE BAIL REFORM ACT

The Court afforded both sides all procedural rights outlined in the Bail Reform Act. Given the nature of the charges, no detention presumption arises under the BRA, thus, the burden begins with the United States. Detention premised on nonappearance must rest on facts supported by a preponderance of the evidence. *See, e.g., United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. July 18, 2006). Detention based on danger, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure the safety of the community. 18 U.S.C. § 3142(f). Further, almost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicted compliance with any imposed conditions. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (evaluating predicted good faith compliance as a critical release component).

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The hearing is informal, and the Court may consider a wide range of proof, weighing the evidentiary reliability and accuracy. *See, e.g., United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. June 22, 1998). However, the nature and quality of proof impact its probative value and weight in the detention calculus. The § 3142(g) factors guide the analysis.

B.  **ACKER'S DANGER TO THE COMMUNITY**

In analyzing Acker's potential for danger to the community, the Court considers his history and characteristics, the nature and circumstances of the offense charged, the weight of the evidence against Acker, and the nature and seriousness of the danger to any person or the community that would be posed by Acker's release. *See* 18 U.S.C. § 3142(g). Under the BRA framework, the United States has proven by clear and convincing evidence that Acker poses a danger to the community.

1. **Acker's History and Characteristics**

The Court must consider many aspects of Acker's background in making the decision to release or detain him. Specifically, the BRA requires courts to "take into account the available information concerning— [ . . . ] the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation[.]" 18 U.S.C. § 3142(g)(3).

Acker spent most of his life in Louisville, Kentucky. [PSR at 1–2]. He does not have a relationship with his biological father, and his mother passed away in December 2025. He does, however, maintain a good relationship with his stepfather and biological sister, who reside together in Elmhurst, Illinois. [PSR at 2]. Acker has been married twice, with both marriages ending in divorce. Acker's second union, to Robin Shubert, produced one child, Mackenzie Acker, who currently resides in Louisville, Kentucky. Acker reports a strong relationship with Mackenzie.

Additionally, he reports maintaining regular contact with Robin's daughter from a previous marriage, although he does not have a relationship with Robin's son. Prior to his arrest, Acker was residing in a mobile home on a property he owns in Perry Park, Kentucky; however, if released, Acker would live with his sister in Illinois.

Acker is 57 years old. He reports graduating from Holy Cross High School in Louisville, Kentucky. [PSR at 2]. Following graduation, he completed one semester at Western Kentucky University in 1987. Later, in 1998, Acker completed another semester at the University of Louisville. In 2006, he earned an Associate Degree in Applied Sciences from Ivy Technical College. Acker also earned his electrician certification through the National Joint Apprenticeship and Training Committee. Although he was employed as a contracted electrician prior to his arrest, Acker is currently unemployed due to his custodial status. [PSR at 2]. Furthermore, he reports a history of depression, for which he previously received treatment "off and on." [PSR at 3]. He has not taken any medication for depression since November 2024. Although Acker reported previous experimental use of cocaine and methamphetamines, he reported only occasional use of alcohol and weekly use of cannabinoids until his arrest in February 2025. [PSR at 4].

Although Acker's criminal history is relatively *de minimis*, the criminal history that does exist presents some significant concerns. Acker's criminal history begins with a 1991 conviction for assault in the second degree. [PSR at 4]. One year later, while still on supervision for the assault conviction, Acker was charged with unlawful transaction with a minor in the first degree, though that charge was later dismissed.

[PSR at 4]. Acker's remaining criminal history is sprinkled with several traffic offenses and one 1995 conviction for possession of marijuana. [PSR at 4–5]. The most concerning aspect, however, is Acker's 2017 conviction for distribution of matter portraying a sexual performance by a minor. [PSR at 5]. In fact, it is even more concerning that the Jefferson County Circuit Court appeared to give Acker extraordinary grace in his sentence: a two-year suspended prison sentence, five years supervised probation, and a $1,000 fine, only for him to find himself in a similar predicament—also involving a minor(s)—less than seven years later.

Although Acker's ties to the state and strong familial support certainly act as mitigating factors, they cannot overcome the aspects of his prior criminal record that demonstrate dangerousness. While brief, Acker's criminal history reflects a propensity for potentially violent and repetitive sexually explicit behavior involving minors. FBI Special Agent Justin Kiehl testified about Acker's technological savvy—utilizing encrypted communications to avoid further detection of his criminal activity. In many ways, this use of encrypted communication demonstrates Acker's desire to continue his criminal behavior, even after his 2017 conviction for a similar offense. For these reasons, this factor supports danger-based detention. *See United States v. Foster*, No. 20-5548, 2020 WL 6791572, at *2 (6th Cir. July 20, 2020), *cert. denied*, 141 S. Ct. 1073 (2021) (concluding that, notwithstanding strong family and community ties and a lack of criminal history, the defendant's "deceptive conduct and unwillingness or inability to change or stop his behavior even after being alerted that it had been discovered does not speak to his strength of character").

**2.      The Nature and Circumstances of the Offense Charged**

The next BRA factor is the "nature and circumstances of the offense charged." 18 U.S.C. § 3142(g)(1). Although the allegations at issue in this case are not among the category of offenses that Congress has deemed particularly dangerous and carrying a presumption in favor of detention, they are serious, nonetheless. *See United States v. Mobasseri*, No. 1:17-CR-00138, 2020 WL 3026070, at *3 (N.D. Ohio June 5, 2020) ("Each download and view of a child-pornographic image or film exacerbates the harm to the child involved in its production."). At the detention hearing, the United States offered proffer and proof of Acker's alleged criminal conduct, mainly through the testimony of FBI Special Agent Justin Kiehl ("Kiehl").

According to Kiehl, two separate investigations by two separate investigatory units, the Federal Bureau of Investigation and the Owenton Police Department, led to the discovery of the conduct underpinning the Indictment.

In October 2023, just one month after Acker's state probation expired, an Online Covert Employee out of the FBI's Honolulu Field Office began interacting with an online user with the name "Delonar" on the applications TeleGuard and Wire. These applications utilize end-to-end encrypted communications, which is common in CSAM cases because it prevents easy detection by law enforcement officers. The user "Delonar" was a member of several groups, including "Creep Shots All Ages," "Play With Me CP 17 Max," and "Kinder 0+ No Rape No Torture."[1] Further investigation revealed that the user "Delonar" created the "Creep Shots All Ages" group and

---

[1] Agent Kiehl testified that in his experience, "CP" is shorthand for "child pornography." The term "kinder" frequently refers to a kindergarten age range.

potentially others.  In the "Creep Shots" group, "Delonar" sent multiple, "original"[2] "upskirt"[3] images of multiple females, one of which appeared to be a minor.  Metadata revealed that the images were shared around April 1, 2024.  Utilizing the background of one of the photos, law enforcement was able to identify the user's location, Louisville, and eventually conducted sufficient investigation to determine that the IP address/phone number utilized by "Delonar" was registered to Timothy Acker.

Subsequent investigation revealed Acker's participation in another TeleGuard group, "Child Gaping."  In this group, the user "Delonar" shared a photo of what appeared to be a minor's exposed vagina and anus.  Additional media shared by other users in the "Child Gaping" group included a young (0–3-year-old) child being penetrated by a penis.

In February 2025, the Owenton Police Department conducted a traffic stop by a children's playground at the Owen County Fairgrounds.  The traffic stop revealed Acker, a registered sex offender, sitting in his car eating McDonald's.  [PSR at 6]. During the stop, law enforcement officers smelled marijuana and discovered Acker's sex offender status.  When asked why he was at the park, Acker explained that he was new to the area and thought it would be cool.  Upon subsequent search of the vehicle, officers seized several phones and hard drives.  The search of Acker's home revealed a laptop containing additional CSAM materials.  In total, Kiehl testified that

---

[2] As self-described by the user "Delonar," indicating that he was responsible for the creation of each of the "upskirt" images.
[3] The term "upskirt" refers to surreptitiously taking photos from a low angle up an individual's skirt or dress without her consent.

more than 5,000 media files containing CSAM materials were found in Acker's possession. This media ranged drastically in the ages of minors depicted (from infants to teens), involved in various sexually explicit activities.

Furthermore, agents uncovered a TeleGuard conversation involving Acker where he indicated that he was having conversations with a sixteen-year-old who was allegedly creating sexually explicit images for Acker's use. To date, law enforcement has not identified the minor nor corroborated this information, but the fact remains: the messages suggest that Acker believed that a minor child was producing sexually explicit images for his (and potentially others') use.

The testimony presented at the detention hearing tends to show Acker's active role in an online CSAM community, with Acker going so far as to create at least one group and share "original" media, with at least one image depicting an apparent minor. Following his move from Louisville, Acker was found with an extensive volume of CSAM materials, varying substantially in age. A collection of this breadth is alarming, especially considering Acker's status as a registered sex offender. Finally, although there was no corroboration, the indication that Acker was communicating with a minor to obtain CSAM material adds to this Court's level of concern. Thus, considering the charged offense and Kiehl's testimony, this factor firmly favors detention.

### 3. The Weight of the Evidence of Dangerousness

In weighing the strength of the evidence, the district court may not modify or limit the defendant's presumption of innocence. 18 U.S.C. § 3142(g). "[T]he § 3142(g) analysis is concerned with a practical assessment of the defendant's dangerousness,

rather than an adjudication of guilt for a particular offense." *United States v. Tolbert*, 2017 WL 6003075, at *5 (E.D. Tenn. Dec. 4, 2017) (citing *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010)).

This factor is somewhat duplicative of § 3142(g)(1) and (3) because, in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history and a history of violent behavior. Here, this factor weighs in favor of detention.

The apparent long-term nature of Acker's conduct weighs in favor of finding a heavy weight of dangerousness. Specifically, Kiehl testified in detail of Acker's involvement in several online groups that shared images and videos of pre-pubescent minors involved in sexually explicit conduct as early as October 2023. Although there was no direct evidence that Acker committed hands-on offenses with children, Kiehl testified about details suggesting that Acker communicated with a minor in pursuit of sexually explicit material. Additionally, Acker personally created and distributed multiple "upskirt" photos, one of which depicted an apparent minor.

Outside of the current charges and as previously discussed, Acker has also faced punishment for a similar conviction within the last ten years. Even after facing that punishment, and only one month after the expiration of his probation, Acker was found communicating with and taking an active role in an online CSAM community. Further, Acker has demonstrated a propensity for violence at least once in the past, although the Court notes that it was nearly thirty-five years ago. After balancing

these considerations, the Court finds that there is some weight to the evidence of Acker's dangerousness sufficient to tip this factor towards detention.

### 4. The Nature and Seriousness of Danger Posed by Release

For the fourth and final factor under the BRA, the Court must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). In cases involving child sex abuse materials, courts in this district have previously recognized the grave threat such conduct poses to the community. *See United States v. Kinison*, No. 5:12-CR-57-JBC-REW, 2012 WL 4433296, at *4 (E.D. Ky. Sept. 24, 2012) (finding substantial danger risk where evidence demonstrated that the defendant had "a plain, prurient interest in children" and had been handling child exploitation materials).

At the detention hearing, Acker presented a detailed plan for his release. The Court acknowledges the potential validity of that plan and that Acker's sister would be a good resource; however, these parts do not outweigh the whole. Acker's continuous, active involvement in the CSAM community, very shortly after completing probation for a similar charge, demonstrates his apparent inability or unwillingness to abstain from, at the very least, seeking out and digesting sexually explicit materials involving minors. And, the mere circumstances of his arrest, at a playground, in violation of the conditions of his status as a registered sex offender, demonstrate Acker's apparent lack of concern for the criminality of his actions.

In sum, the BRA factors overwhelmingly support a finding that Acker presents a substantial danger to the community and strongly favor detention. Furthermore, the Court seriously doubts the availability of conditions that will adequately guard

against any danger that Acker presents. Clearly, Acker's status as a registered sex offender did not prevent him from engaging with an online CSAM community, creating sexually explicit images, sharing those images, and possibly communicating with a minor regarding the creation of additional material. In fact, the evidence presented suggests that Acker consciously chose to fly in the face of the limitations imposed by his registered status. Additionally, Acker's continued use of applications with end-to-end encryption, along with the use of an encrypted email, demonstrates his technological savvy in avoiding detection. This ability is extremely concerning. This Court is aware of the ease of which an individual may purchase or access an internet-capable device. And Acker's experience with end-to-end encryption increases the likelihood that he may successfully subvert any attempt by the United States Probation Office to monitor his activities and detect possible violations. As such, no available conditions will mitigate Acker's risk of danger to a level sufficient for the Court's comfort. Perhaps most importantly, Acker's actions involve a threat to the safety of society's most vulnerable group: children. Sex offenses involving children "are extremely dangerous to the community, particularly because such activities are often hidden from a defendant's closest friends and family members. The Court could order forfeiture of all devices . . . but there is simply no failsafe way to prevent any and all exposure." *United States v. Tang*, No. 3:19-CR-00014, 2019 WL 2453655, at *4 (E.D. Ky. June 12, 2019).

C.    <u>ACKER'S RISK OF NONAPPEARANCE</u>

The United States did not make substantial arguments regarding Acker's risk of nonappearance. Thus, the government did not meet the preponderance burden to

detain Acker based on a risk of nonappearance and non-appearance-based detention is not proper under the BRA.

## II. CONCLUSION

For the above-stated reasons, the Court finds the United States failed to prove by a preponderance of the evidence that Acker poses a risk of nonappearance but proved by clear and convincing evidence that Acker is an irremediable danger to the community and the Bail Reform Act mandates detention.

The Court has assessed the record, contemplated the risks, evaluated the conditions, and determined that no conditions exist that can reasonably assure Acker will not pose a danger to another or the community. Accordingly, the Court **GRANTS** the United States' oral motion for detention and **DETAINS** Defendant Acker.

Signed this 29th of January, 2026.



MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY